Madden, Judge,
delivered the opinion of the court:
By a treaty of March 2, 1868, 15 Stat. 619, a reservation of some 15 million acres was established for the Ute Indians. By an agreement of September 13, 1873, ratified by Act of April 29, 1874, 18 Stat. 36, the Indians ceded to the United States some three million acres of this reservation. See Ute Indians v. United States, 45 C. Cls. 440, 454 (Finding XI). By Executive Orders of November 22, 1875, 1 Kappler 834, February 7, 1879, 1 Kappler 834, and August 17, 1876, 1 Kappler 834, other lands were added to the reservation.
On March 6, 1880, an agreement was made by the chiefs and headmen of the Utes, which was later ratified by the members of the tribes, to cede their remaining lands in Colorado to the United States, after first providing for certain individual allotments to some members of the tribes. Congress, in ratifying this agreement, Act of June 15, 1880, Chap. 223, 21 Stat. 199; 1 Kappler 180, inserted a provision that the lands ceded to the United States and not allotted to individual Indians, were to be sold by the United States, and the proceeds deposited in the Treasury for the benefit of the Indians, after repayment of money spent by the United States in connection with the transaction. The agreement as ratified by the tribe in July and August included this provision. It was in Section 3 of the Act of June 15,1880, and was as follows:
* * * and all the lands not so allotted * * * shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this act: Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only.in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government *422 for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement [certain individual allotments could be made from land outside of the Ute Reservation]. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated [one-half to the Uncompahgre Utes, one-third to the Southern Utes, and one-sixth to the White River Utes], and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act: * * *.
After the agreement of 1880, the United States sold, under the public land laws, a large amount of the acreage ceded by the Indians in that agreement. It also took for its own use, for national forests, public'monuments, and other uses, large amounts of the acreage. It made no accounting to the Indians either for the proceeds of the sales, or for the lands taken for its own use.
By an Act of March 3, 1909, Chap. 263, 35 Stat. 181, 788, 789, jurisdiction was conferred upon this court to ascertain the amount received by the United States for lands sold, and the value of lands taken. In a suit brought by the Indians pursuant to that Act the Indians were compensated for more than four and one-half million acres. See 45 C. Cls. 440; 46 C. Cls. 225. More than seven million acres were still left subject to the agreement of 1880.
Again, after the litigation in this court, the United States sold many tracts from the remaining land, and took for its own use other tracts for national parks, national forests, monuments, etc. This suit does not involve those sales or takings, recovery for them being sought in another suit now pending in this court. After those sales and takings there were still, in 1938, several million acres left which were subject to the agreement of 1880.
In 1938 a bill was pending in Congress, having as its purpose the conferring of jurisdiction on this court to entertain litigation brought by the Ute Indians on all legal and equitable claims which they might have against the *423 United States. Because of some events which, had occurred between 1934 and 1938, an amendment was made to Section 6 of the bill, which amendment has given rise to serious questions in this case. We now recite those intervening events.
The Indian Reorganization Act of June 18, 1934, Chap. 576, 48 Stat. 984, Sec. 3, authorized the Secretary of the Interior to restore to tribal ownership “the remaining surplus lands of any Indian reservation heretofore opened or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States.” The Secretary of the Interior, purporting to act under this statute, temporarily withdrew from disposal by the United States the Ute lands ceded by the agreement of 1880 but hot yet disposed of “until the matter of their permanent restoration to tribal ownership * * * can be given appropriate consideration.” Thereafter, by orders of July 17 and November 13, 1937, the Secretary did restore to tribal ownership of the Utes, two tracts of the land, the first containing about 30,000 acres and the second about 8,500 acres. Some of the stock-raising constituents of Senator Adams of Colorado were alarmed when they learned of this action, since, if the Secretary should restore to the Indians the rest of the millions of acres of land remaining subject to the agreement of 1880, as he had the two tracts, he would thereby deprive these stock raisers of much of their grazing area. The Senator therefore prepared an amendment to Section 6 of the jurisdictional bill which was pending in 1938. The amendment wras offered and adopted. Section 6, as enacted, with the amendment indicated by italics, was as follows:
Sec. 6. If the court shall find that any lands formerly belonging to the said bands of Ute Indians or any of them, have been taken by the United States without compensation therefor and set apart and reserved as national reservations or for other public uses or otherwise classified, reserved, or withdrawn from entry and sale under the public land laws or disposed of in any manner whereby the said Indians have been deprived of the use or benefits of such lands and the natural resources thereof, it is hereby declared that such action *424 shall be sufficient grounds for equitable relief and the court shall render judgment in favor of said Indians, and shall award to them, as for a taking under the power of eminent domain, compensation for all such lands and natural resources, any thing in any other Acts of Congress to the contrary notwithstanding, no lands in Colorado north of and including range 35 formerly owned or claimed by the Ute Indians or any band thereof shall be restored to tribal ownership under the provisions of section 3 of the Act of June 18, 1931 (18 Stat. 981) , (Mid said lands to the extent that they home not been disposed of by the United States are hereby declared to be the_ absolute property of the United States: Peoyided, That there is hereby added to the existing Southern Ute Indian Reservation in foibal ownership of the vacant, undisposed of ceded lands within the following described boundaries:
\Describing certain lands by metes and bounds.]
PROVIDED further, That am/ orders restoring or attempting to restore to tribal ownership any portion of the lands in Colorado north of range 35 are hereby rescinded and annulled.
The bill as enacted containing Section 6, as amended, became the Act of June 28, 1938, Chap. 716, 52 Stat. 1209. Some errors, not here material, in the section as then enacted were corrected by the Act. of July 15, 1941. The meaning of the section was not changed.
Unquestionably the amendment to Section 6 of the 1938 act had the following effects. (1) It forbade the Secretary to restore to the Utes any more of the lands in question north of and including township 35.[1] (2) It revoked the Secretary’s order previously made restoring some 8,500 acres of land to the Utes, this land lying north of township 35. (3) It either ratified the Secretary’s act of restoring, or it transferred, to the Utes, the 30,000 acres adjoining their present reservation, which the Secretary had purported to restore to them by his order of July 17, 1937.
Plaintiffs claim that the Adams amendment had the further important effect of “taking” from them their interest or interests in all of the land covered by the cession and agreement of 1880 which had not theretofore been sold by *425 the Government or appropriated to its own use. They attribute this effect to the following language in the amendment, in the context in which it was used:
* * * and said lands to the extent that they have not been disposed of by the United States are hereby declared to be the absolute property of the United States: * * *
They urge that the agreement of 1880, in effect, placed in the Government only such title to and power of disposition over the lands as to enable it to sell them for the benefit of the Indians, thereby making the Government a trustee and leaving the beneficial ownership of the lands in the Indians. This beneficial ownership, they assert, was extinguished by the Adams amendment, without compensation, thus bringing the situation within the jurisdiction conferred upon the court by the other language of Section 6 of the 1938 act, as one entitling the Indians to a judgment for compensation for a taking of their lands.
The Government’s response to this claim is that the Indians in the agreement of 1880 conveyed their lands to the Government absolutely, for considerations satisfactory to themselves, and therefore the statement in the Adams amendment that the .lands “are hereby declared to be the absolute property of the United States” was no more than a declaration of a status which had existed for nearly sixty years, but which the Secretary of the Interior and perhaps others had misunderstood, and which for that reason needed a clarifying declaration.
The interests and obligation's created by the agreement of 1880 do not fit readily into conventional legal concepts, such as trusts, agencies, debts or contractual obligations, and mortgages or security interests. The problem is further complicated by the fact that one of the parties to the transaction was a sovereign which could and did, .regardless of the terms of the agreement, do what it pleased with the lands and their proceeds, giving the Indians the privilege of having their legal rights determined only at long intervals, such as in 1909 and 1988 when the sovereign deigned to waive its immunity from suit.
*426 According to the Government’s contention, when the Indians, in 1880, “released and conveyed” the title to their lands to the United States, that made the United States the absolute and unqualified owner of the lands. In return, the Indians received the promise of the United States to expend specified sums of money for the education of the Indian youth, and for the removal and resettlement of the Indians to their allotments; to pay certain amounts in annuities and to set up a trust fund for further annuities; to select allotments on property not belonging to the Indians and allot them to individual Indians; to furnish agricultural implements to the Indians on their allotments; to open the lands for sale as public lands “and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this Act by the Government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this Act.”
So, the Government urges, the Indians conveyed their lands for some cash and some promises, and that made them legal strangers to the land. As to the cash to be given them and expended for them, it was all to be reimbursed to the Government out of the first proceeds of sales to be made by the Government of the conveyed lands. It was therefore, not an independent consideration paid by the Government, but, to whatever extent necessary, an advancement made to the Indians out of their own prospective funds, the proceeds of sales of the lands. The same may be said of the allotments to be given to some of the Indians on other lands. The Government was to be paid for these at the going rate of $1.25 per acre, out of the Indians’ money.
In essence, then, the Indians conveyed their lands to the Government for the latter’s promise to open them for sale *427 as public lands and put tbe proceeds in the Treasury as the Indians’ money. Did the Indians by this conveyance part with all their interests in the land as property? It must have been contemplated that something like what has actually happened, would happen; that a good deal of the land would be fairly promptly selected and bought by settlers; that some of that not selected might be sought by stockmen for grazing leases, or by miners for development leases; that some would not, for a long time, or perhaps ever, be selected for purchase. Did the parties contemplate that, until the land was selected for purchase, the Government, though it owned it outright, Avas to be restricted by the implications of the agreement from leasing it for grazing or mining; that it must lie useless to both parties and to the public until sold pursuant to the agreement, which sale might never occur? Did the parties mean that the Indians could not say, “The remaining several million acres of this land have been available for sale for almost sixty years, but have not seen sold ? The Government cannot use it, so it lies useless. We should like to have it back, unless the Government desires to make some new arrangement with us whereby the land may be used and we may get some return for our having parted with it.”
As we have said above, it is impossible to consider this situation as if the parties here were private persons. In fact the Government, by reason of its sovereign immunity from suit, did substantially as it pleased with the land. It converted large parts of it to use as national forests and parks and monuments. It leased some of it to stockmen for grazing, and to miners for mining. It did all these things without consultation with the Indians, yet none of them were authorized by the words of the agreement of 1880. Whether the Government thought it was acting within the implied meaning of the agreement of 1880, when it did these things, does not appear. Because of its immunity, it was not necessary for it to justify them when done. In 1909, after it had taken many of the lands for public purposes it, by statute, gave this court jurisdiction to compensate the Indians for the taking. This is an indication that it did not think that it already owned them, without qualification. *428 The Department of the Interior put the grazing and mining rentals into the Indian funds. This is an indication that, in the opinion of the Department, the rents and profits of the lands, while they remained unsold, belonged to the Indians.
We can hardly imagine a private owner conveying his lands to another, intending to give him an absolute and irrevocable title to them, and receiving nothing in return but the other’s promise that the lands would be made available for sale in a specified way, and, when, as, and if any of them were sold, the proceeds would be given to the conveyor. Such a transaction would be so improvident from the conveyor’s standpoint, involving the loss of the use of the land and the probability that he would never receive any return from at least some of it; and so contrary to public policy, preventing the conveyee and others from making any use of the lands for an indefinitely long time, that a court would not find that it had been intended unless clear language showing such an intent had been used. If the intent was not clear, a court would find that a trust or agency had been created, and would permit the conveyor-to get back the land so that if it could not be sold it could at least be used. Even if the improvident intent was found, a court of equity might well construct a quasi-trust in such a case, in order to do justice and put the land back into use.
In the instant case, it may be that the agreement of 1880 contemplated, from the Government’s side, not merely the advantage of making this land available for white settlers who might purchase it, but the advantage of getting the Indians off it and confining them to narrower boundaries where they could more readily be “civilized” or at least watched and restrained. So it may be that the Government did not intend, in 1880, that the Indians should ever get their land back, even if it remained forever unsold. And if that was the public policy which the 1880 statute presupposed, there would have been that reason of policy why a court would not have constructed a remedy of returning the unsold lands to the Indians, even if the Indians could have brought a suit seeking that relief, which of course they could not have done because of the Government’s immunity from suits not consented to by it.
*429 Even if, as we have just suggested, it was the intention of the 1880 agreement that the Indians were never to get their land back, even if it remained unsold, we think it was equally the intention that the Government was not to have the use .and benefit of the land, but only the power to sell it. It would have been wholly inequitable that the Government, not having paid or promised to pay the Indians anything except out •of the proceeds of such lands as should be sold, which proceeds, except as they were so used to reimburse the Government, were to- belong to the Indians, should have had the úse of land for which it paid nothing. The Government has not, so far as appears, claimed until now that it had that right. On the contrary, having taken some of the lands for public forests, parks, and monuments, it consented in 1909 to be sued for the value of land so taken. When some of the land was leased for grazing and mining, the Department of the Interior placed the rentals to the credit of the Indians. These acts were strong indicia of the opinion of Congress and of the Executive Department concerned that the Government did not have such an absolute ownership of the land as to enable it to devote the land to its own use or to make a profit from permitting its use by others. The Wheeler Act of 1934, which seems to us to have been applicable to the lands in question, was another strong indication that .the Government thought that it was not right for it to keep indefinitely lands which Indians had conveyed to it upon its agreement to sell and deliver the proceeds to the Indians, when in fact the lands had not been sold. Whatever may have been the motive of Congress in enacting the 1934 statute, the Department of the Interior in its administration took the view that the plaintiff Indians still had an interest in the unsold lands in question. The Department also took that position in its communication to the Director of the Budget in 1938, recommending Presidential approval of the jurisdictional act with the Adams amendment. Thus everyone concerned on behalf of the Government seems to have thought that plaintiff Indians had not, in 1880, made themselves strangers to the land they thereby conveyed;
The legal or equitable connection between the Indians and their former land is not easy to define, but that there was *430 sucb a connection everyone concerned seems to have agreed, until this litigation began. If the connection, or “interest” was no more than a negative right that tlie United States should do nothing with the land except sell it pursuant to the provisions of the 1880 agreement, that was an important restriction upon the Government’s ownership, and left in the Indians some sort of a right or interest in the land correlative with the restriction. That the Indians had at least this much of an interest we have no doubt. If they did, the lands were not then “the absolute property of the United States” as they were declared to be by the Adams amendment in 1938. It follows that that amendment effected an addition to the title of the United States, and an extinguishment of at least some interest in the Indians. It amounted to a “taking” of land of the Indians, within the meaning of the jurisdictional act.
The Government does not make entirely clear what it thinks the rights and privileges of the Government and the Indians were before and after the 1988 act. In its brief, at page 180, it seems to say that the Department of the Interior’s practice before 1938 of depositing the rents received from grazing and mining tenants to the credit of the Indians was wrong. It was, if the Government became the absolute owner of the land in 1880. But if it did, it could sell the land or use it for its own purposes as it chose, and without accountability. Yet surely it could not use instead of selling, and thereby deprive the Indians of their only possibility of getting any return for their conveyance. And it was so obviously equitable, or at least moral, to give the Indians the rents from lands that were not sold but rented, that it inclines us to think it was also legal, and not wrong.
As to the status since the 1938 act, the Government says at page 184 of its brief that the Indians still have, all that they have ever had since 1880, a right to the proceeds of their sale “if and when the lands were sold”; that therefore nothing was taken from them in 1938 and their suit must fail. This would seem to mean that the Government still has no right to convert any of the land to use as parks, forests, or monuments; that if it does so it violates its contract of 1880 and could perhaps, except for its *431 sovereign immunity, be enjoined from so doing. But what kind of “absolute property of the United States” is it which cannot be used for a public park without violating the rights of the Ute Indians? And what kind of a contract right is that of the Ute Indians to the proceeds of the sale of the lands, if the holder of the title can in the meantime make a profit for itself or serve another purpose for other constituents by leasing the land instead of selling it ? And if it can lease it, can it tie it up under a grazing lease which makes it difficult to sell it, and thus divert the proceeds of the land from the Indians’ fund to its own Treasury [See plaintiffs! reply, p. 277 for elaboration of this] and the lands to a purpose which will serve a policy of the United States but will prevent the Indians from getting paid for them.
No judicial decision has been called to our attention which is not consistent with the Indians’ claim that, under the agreement of 1880, they retained an interest in their former reservation. Statements that the United States was, in comparable situations, a trustee for the Indians for the purpose of selling the land, appear in the opinions of the Supreme Court of the United States in a number of cases. The most pointed of these statements are in United States v. Brindle, 110 U. S. 688, 693; Minnesota v. Hitchcock, 185 U. S. 373, 394; and United States v. Mille Lac Band, 229 U. S. 498. The Government urges that the language of the agreement in question in the Brindle case, to the effect that the lands were to be surveyed, entered, etc., “in the same manner” as public lands of the United States, showed that the lands were not really to be public lands, and was merely a shorthand expression granting to the United States the power of disposition of the lands as if the lands were public lands. The Government urges, by way of contrast, the language of Section 3 of the Act ratifying the 1880 agreement which said that the lands
shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this Act:
*432 and the corresponding applicable language in the Act of 1882, 22 Stat. 178, providing that the land
be, and the same is hereby, declared to be public lands of the United States.
The Government says that these forms of words are words showing complete ownership and not the ownership of a trustee or other limited owner. But we think the whole 1880 agreement and the interpretation given to it by the Government itself show that the Government’s ownership was intended to be subjected to important limitations, with regard to its powers of disposal, rights of use, and rights to retain and enjoy rents and profits. The language upon which the Government relies is certainly not strong enough to contradict the otherwise clear intent of the agreement to curtail the Government’s ownership. We think therefore that the Brindle case may not be satisfactorily distinguished on the ground of the difference in language. And we think that the Hitchcock and Mille Lac cases, supra, are not satisfactorily distinguished by the fact that in those cases some of the bands of Indians retained, until their allotments were made, some right of occupancy, as to some of the lands. The question in those cases, as here, was whether the Indians still had an interest, after their right of occupancy was gone, in the lands, the proceeds of whose sale they were to receive. The court placed no emphasis upon the fact of the right of occupancy, and, as to much of the land in dispute and as to some of the bands of Indians, there was no right of occupancy.
We do not think it is necessary in the instant case to determine whether the Government was, in the ordinary sense of that word, a trustee of the lands in question for the plaintiffs. We think it is enough to determine, and we do determine, that, under the agreement of 1880, the plaintiff Indians retained an interest in the lands, which interest was completely destroyed by the United States when it inserted the Adams amendment in the 1938 act. And we think that the way to fairly compensate the Indians for the taking of that interest, which taking finally deprived them of any further right to receive the proceeds from the sale or rental of the land, is to pay them the value of the land as of 1938, the time of the taking of their interest.
*433 We conclude, therefore, that plaintiffs are entitled to recover. In further proceedings it will be necessary to determine the amount of the lands which remain unsold and not otherwise appropriated by the Government to other uses. It will also be necessary to ascertain the value of the land taken, there being nothing in the 1880 agreement or any other pertinent arrangement between the parties which fixes that value.
It is so ordered.
WhitakeR, Judge; LittletoN, Judge; and Whalev, Chief Justice, concur.
JoNes, Judge, took no part in the decision of this case.

 The word “range” in the 1938 act was intended to mean “township.” The correction was made in the Act oí July 15, 1941, referred to above.