Madden, Judge,
delivered the opinion of the court:
In former proceedings in this suit the court has held that the plaintiffs are entitled to recover just compensation for their interests in land, which interests were taken by the United States by Section 6 of the Act of June 28, 1988. The former proceedings are reported in 100 C. Cls. 413. In them no evidence was produced showing that any particular land had been taken, and, of course, there was no evidence of value of any land. These matters had been reserved, pursuant to Buie 39 (a) of this Court, to await the determination of the question whether or not the Government was liable for the value, as of June 28, 1938, of such part of the lands received from the plaintiffs by the agreement which was embodied in the Act of June 15, 1880, c. 223, 21 Stat. 199, as had not, before June 28, 1938, been disposed of by the Government. The parties had stipulated that there were some thousands of acres of such lands. (100 C. Cls. 413, 418, Finding 7).
Soon after this suit was filed, this Court, on the plaintiffs’ motion, issued a call upon the Secretary of the Interior to furnish a statement of what lands the Government still had of the lands originally ceded to it by the plaintiffs. Large acreages of the lands had been disposed of or appropriated by the Government and had been paid for after an earlier suit in this Court. The Ute Indians v United States, 45 C. Cls. 440; 46 C. Cls. 225. After the judgment in that suit, other large acreages had been disposed of or appropriated *128 by the Government. 100 C. Cls. 413, 417, 418, Findings 6 and 7. The Secretary of the Interior, in his return to the Court’s call, presented nine exhibits, listing the descriptions by legal subdivisions of some five million acres of land, stated by him to be. still held by the Government. The parties checked the Secretary’s return and discovered errors which were called to the Secretary’s attention, after which he made a supplemental return.
After the interlocutory decision of this Court, referred to above, the case was referred to a Commissioner of this Court who took voluminous evidence on the question of the valuation of the surface of the lands described in the Secretary’s return. The parties had agreed that, for convenience, they would try separately the issue of the value of the minerals in the lands. The Government says that in preparing its proposed findings to offer to the Commissioner, it has become necessary for it to know which of the lands included in the Secretary’s return are the proper subject of this suit, hence it has filed the motion here involved, requesting the Court to instruct its Commissioner on that question. Shortly stated, the Government’s contention is that by various stated acts of the Government, done before June 28, 1938, the date of the alleged taking, the Government had already taken most, or perhaps all of the lands listed by the Secretary in his return, and claimed by the plaintiffs to have been taken on the date of the enactment of the 1938 statute. Since the plaintiffs have been authorized by the same Act of June 28, 1938, c. 776, 52 Stat. 1209 to sue for lands taken before the date of that Act, and since the plaintiffs have other suits now pending in this Court which cover such lands, it might seem that the only issue raised by the motion is that of whether some elements of the plaintiffs’ recovery should be included in its judgment in this suit, or in one of its other pending suits. But the question is more important than that. It is the question whether the values of the lands in question should be fixed as of June 28, 1938, or as of some other date, in many cases much earlier, when, the Government seems to think, the values were much smaller.
The plaintiffs concede that 128,041.33 acres of the land included in the Secretary’s return had been taken by the Gov- *129 eminent before June 28,1938, and are not a proper subject of tbis suit. All but about a thousand acres of this land was- set apart at one time or another for the purposes of National forests. Of the two small pieces not placed in national forests, one was taken for a National monument and one for a naval oil reserve. The plaintiffs say that such takings amounted to permanent and final dedication of the land to public use, and concede that the taking of these lands occurred at the time they were assigned to those uses. This concession leaves 1,532,616.88 acres in dispute, and subject to the Government’s motion except for a qualification which will be stated hereinafter.
The circumstances in which the United States came into control of the lands here in question are recited in our former opinion in this case, 100 C. Cls., 413, 420 and will not be repeated here at length. The agreement, embodied in the Act of June 15, 1880, c. 223, 21 Stat. 199, by which the plaintiffs ceded their lands to the United States said, in Section 3:
* * * and all the lands not so allotted * * * shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this act: Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds, of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement (certain individual allotments could be made from land outside of the Ute Reservation). And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion here-inbefore stated [one-half to the Uncompahgre Utes, one-third to the Southern Utes, and one-sixth to the White River Utes], and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act: * * *.
*130 In onr former decision in this case we held that the agreement of 1880 left the plaintiffs with an equitable property interest in the ceded lands, difficult to place in any conventional category, but comparable to a trust. The United States, as trustee, because of its sovereign capacity, could and did breach its trust by doing many things with the ceded lands which it was not authorized by the agreement to do. It has, by the Act of June 28,1938, under which this suit is brought, consented to be sued by the plaintiffs, hence we consider the effects of its actions.
We have said that there are 1,532,616.88 acres of the land included in the Secretary’s return here in dispute. But the Government further contends, not too vigorously, that none of the approximately five million acres covered by the return are the proper subject of this suit, and we shall deal first with that contention. The Government’s position is a contradiction of the stipulation in which it joined, and which is embodied in our Finding 8 in our interlocutory decision in this case, 100 C. Cls. 413, at 418. The Government asks to be relieved from that stipulation, and we do so relieve it, but we find, on the basis of the documents in evidence and the applicable law, that our Finding 8 was and is correct.
The Government’s contention that it had earlier disposed of all the lands ceded by the plaintiffs, and that no land remained to be taken by the Act of June 28, 1938, is based upon several actions taken by the Government. The first assertion is that the enactment of the Ute Free Homestead Act of June 13, 1902, 32 Stat. 384, had the effect of taking all the land ceded in 1880 by the Utes, and not disposed of before June 13, 1902. The Ute Free Homestead Act threw the lands open for free homesteading, instead of requiring that they be sold for cash, as provided in the 1880 agreement. This was, perhaps, a breach by the Government of the 1880 agreement, but the Government expressly obligated itself, in the 1902 statute, to pay to the Utes any cash deficit resulting from the change in the manner of disposing of the lands. It will be remembered that the lands included in the Secretary’s return were not in fact patented to homesteaders, but remained, in 1938, in the control of the United States. We think that the mere fact of the enactment of *131 the 1902 act did not convert the plaintiffs’ equitable interest in the lands into a mere right of action for breach of trust. The United States, the trustee, still owning the land’ in 1938, we think it still owned it for the use and benefit of the plaintiffs.
The Government’s second contention that all of the lands included in the Secretary’s return had been disposed of by the United States before 1938 is based upon Executive Order 6910 of November 26, 1934, and the inclusion of the lands within grazing districts under the Taylor Grazing Act of June 28, 1934, c. 865, 48 Stat. 1269, 43 U. S. C. 315. Executive Order No. 6910 directed that “all of the vacant, unreserved and unappropriated public lands” (in certain western states and including the lands here in question) be “temporarily withdrawn from settlement, location, sale or entry and reserved for classification pending determination of the most useful purpose to which such lands may be put, in consideration of the provisions of” the Taylor Grazing Act “and for the conservation and development of natural resources”. The withdrawal made by Executive Order No. 6910 was authorized by the Pickett Act of June 25, 1910, 36 Stat. 847, 43 U. S. C. 141, which is referred to later herein, and which provided for the withdrawal of public lands for the purpose of classification, or of study of their more economical use. The Taylor Grazing Act itself in its Section 1 states that its purpose is to promote the highest use of the public lands pending their final disposal, and for that purpose authorizes the Secretary of the Interior to create grazing districts in them. We think that this use of the lands in which the plaintiffs had an equitable interest, and which had lain for decades without any return of income to the plaintiffs, did not destroy their interest in the lands. We found in our previous decision herein that the rentals paid by the grazers on these lands were credited to the plaintiffs which showed that the Government continued to recognize their interest in the lands.
The Government contends that the Mineral Leasing Act of February 25, 1920, c. 85, 41 Stat. 437, 30 U. S. C. 181 by which it was provided that the minerals in public lands should not be sold outright but should be leased reserving a *132 royalty of a fixed sum per unit of production, or a percentage of the production destroyed the interest of the plaintiffs in the lands in question. Since the lands ceded by the Utes were required by the 1880 agreement to be treated as public lands of the United States, the Secretary of the Interior held, in 1920 in the case of Frank A. Kemp, 47 Land Decisions 560, that the Mineral Leasing Act covered the ceded Ute lands. He said in his decision that the “Indian title” to these lands had “long since been extinguished.” To whatever extent the meaning of that language is inconsistent with our interlocutory decision in this case, we still disagree with it. But we think that, the United States having concluded that leasing was a more provident way of dealing with its own public lands containing minerals than outright selling, it may have been its duty, as trustee of the Indians’ interest in the ceded Ute lands, to extend the same provident treatment to the Ute lands that it did to those owned outright by it. In any event, we think that the mere statutory provision that the- lands should not be- sold but leased would not affect the plaintiffs’ interests in such lands as were, in fact, neither sold nor leased. Nor do we think that the fact that some of the land may have been leased affected the plaintiffs’ equitable interest in the leasehold or the reversion. Prior to the Act of June 28, 1938, the plaintiffs had received the rental from such lands, and also owned the reversion. Both these interests were extinguished by the 1938 act. Cf. 100 C. Cls. 413, 432.
We return now to the main contention of the Government which is that 1,532,616.88 acres of the lands covered by the Secretary’s return are not the proper subject of this suit. The actions of the Government with reference to various acreages of this land asserted by it to have amounted to takings occurring before June 28, 1938, were withdrawals of the acreages from their status as public lands of the United States and were taken under the authority of the Pickett Act of June 25, 1910, c. 421, § 1, 36 Stat. 847, 848; 43 U. S. C. 141 (1,198,890.72 acres); the Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388, 43 U. S. C. 416, et seq. (319,727.14 acres); the Federal Power Act of June 10, 1920, c. 285, § 24, 41 Stat. 1063, 1075, 16 U. S. C. 818 (4,557.58 *133 acres); and under implied Congressional authority granted .to the President to withdraw lands for military reservations. United States v. Midwest Oil Co., 236 U. S. 459, 470, 471 (9,441.44 acres).
The portion of the 1880 agreement quoted above gave to the ceded Ute lands the status of “public lands of the United States” but restricted the manner in which they might be disposed of. The Pickett Act, cited above, provided:
That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.
Executive Orders at one time or another withdrew 1,011,-335.07 acres of the land here in question “for further examination and classification and appraisement with respect to coal values”. By June 28, 1938, 640,026.85 acres of this land had been classified as coal lands and the remaining 371.308.22 acres had been released from the withdrawals. We think that the withdrawal of these lands from their status as public lands was the kind of prudent management that was proper for a trustee. The Pickett Act enabled the United States to protect the public lands owned beneficially by itself, by permitting it to reexamine and reclassify lands which it thought might have exceptional value, thus preventing them from being disposed of at a price which took no account of that value. Since the United States had agreed to treat the ceded Ute lands as public lands of the United States, it was, probably, under a fiduciary duty to see to it that they were not improperly classified and sold for less than they were worth. In any event, it was not a breach of trust to thus prudently manage the trust property, and did not destroy the plaintiffs’ interest in the lands and convert it into a law suit. After the reexamination of the lands for the purpose of classification, they again became for sale, 640,026.85 acres of them as coal lands and the remaining 371,-308.22 as non-coal or ordinary lands.
*134 By Executive Orders of July 2,1910 and October 25, 1918, 85,914.50 acres were “withdrawn from settlement, location, sale or entry, and reserved for classification and the aid of legislation affecting the use and disposal of petroleum belonging to the United States.” The Secretary’s return shows that" of these acres, 50,854.43 are shown as coal and non-coal lands, and 35,060.01 as being petroleum reserves on June 28, 1938. But the return shows that all were within the control of the United States, and had not been so disposed of as to destroy the equitable interest of the plaintiffs in them.
By executive and departmental orders between 1910 and 1919, 71,456.07 acres were “temporarily withdrawn from all forms of entry selection, disposal, settlement or location as possible power sites.” These orders were withdrawn only as to 3,621.56 acres. But the Secretary’s return shows that the remaining acreage had not, in fact, before 1938 been dedicated to use as power sites, and we think that the plaintiffs’ interest in it had not been impaired.
By various orders of the Secretary of the Interior made between 1917 and 1931, 28,185.08 acres were “withdrawn from all disposal under the public land laws and reserved for use by the general public as stock driveways”. Thereafter, before June 28,1938, the Secretary revoked these withdrawals as to all of this acreage except 3,955.14 acres. As to both the acreage which had been restored for all purposes to the public domain, and as to that over which the stock driveway easement still existed in 1938, we think that the plaintiffs’ interest was intact.
By Executive Order 1,280 acres were “temporarily withdrawn from lease or other disposal and reserved for the purpose of investigation, examination and classification.” This withdrawal had not been revoked in 1938, but as we have indicated above, we think that the plaintiffs’ interest was not affected by it.
By Executive Orders of April 8, 1919, April 17, 1926 and July 1, 1929, 720 acres were “withdrawn from settlement, location, sale or entry and reserved for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916 (39 Stat. 862) as public water reserves.” As to 40 of these acres, the withdrawal was revoked in 1930. *135 We think the plaintiffs’ interest in all of 720 acres was unaffected.
The Government contends that 319,727.14 acres which were withdrawn “from entry, except under the homestead laws” pursuant to the Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388, 43 U. S. C. 416, are not a proper subject of this suit. Section 2 of the Reclamation Act authorizes and directs the Secretary of the Interior “to make examinations and surveys for, and to locate and construct * * * irrigation works for the storage, diversion, and development of waters.” It authorizes him, prior to the time of beginning such a survey, to withdraw from entry, except under the homestead laws, any public lands believed to be susceptible of irrigation from such works. If after the survey he concludes that the project is impracticable or inadvisable he is required to restore the lands to entry. If after the survey he concludes that the project is practicable, he is directed to give public notice of the lands irrigable under the project and permit entry on those lands under the provisions of the homestead laws. Two types of withdrawals are prescribed; first form withdrawals for lands that may be needed for the irrigation works themselves, and second form withdrawals for the lands susceptible of irrigation from the works. Of the 319,727.14 acres now under discussion first form withdrawals were used for 78,869.76 acres and second form withdrawals for 240,857.38 acres. The withdrawals were made by various orders between 1902 and 1910. Before June 28, 1938, revocations of first form withdrawals had been made as to 29,015.89 acres, and of second form withdrawals as to 168,830.57 acres. As to the first form withdrawals, if, after withdrawal the land had actually been used or assigned as the site for an irrigation works, we suppose that the interest of the plaintiffs in it would have been extinguished. But the Secretary’s return indicates that none of the lands he listed had been so assigned. They were, apparently, still under study as to whether they should be so used, or whether the withdrawals should be revoked, as they had been for a considerable part of the land. We think the Government had not disposed of these lands in such a way as to affect the plaintiffs’ interest *136 in them. As to the second form withdrawals, our discussion above shows our view that the mere fact of the withdrawals, in the cases where they were later revoked, had no effect upon the plaintiffs’ interests. In the cases in which they had not, by 1938, been revoked, but in which the land still remained under the control of the Government, either to revoke the withdrawal or to build the project and dispose of the land to individual owners, again we see nothing which affected the plaintiffs’ interest, such a disposition not having been made.
The Government contends that the withdrawal of 4,557.58 acres of the land here in question under the authority of the Federal Power Act of June 10, 1920, c. 285, § 24, 41 Stat. 1063, 1075, 16 U. S. C. 818, destroyed the plaintiffs’ interests in those lands at the time of the withdrawal. Under that act a person may apply to the Federal Power Commission for the use of certain land as a site for a power project. The Commission may then order a withdrawal of the land from entry, location, or other disposal while it studies the application. If it finds the site unsuitable it must revoke its order of withdrawal. If it finds it suitable, it may give the applicant a permit for the use of the land for the purpose. As to the acreage here in question, it does not appear that the Commission had in 1938 revoked its withdrawal of any of the land, nor does it appear that any power project had been built upon any of the land, nor that a permit to build had been granted. We think that the plaintiffs’ interest in this acreage had not been destroyed.
The Government contends that 8,589.09 acres withdrawn by the President in 1881 for the Fort Crawford Military Reservation, and 852.35 acres similarly withdrawn in 1884 for the Uncompahgre Cantonment destroyed the plaintiffs’ interest in those lands. These lands ceased to be used as military reservations in the late 1880’s, and from that time were treated by the Secretary as the rest of the ceded Ute lands were treated. L. V. Bryant, 3 Land Decisions 297, Schmidt, et al v. Masters, 18 id. 533. We think the plaintiffs’ interest in them was intact in 1938.
The Government urges that lands covered by the Secretary’s return as to which “pending” or “incomplete” entries, *137 or mining “locations” liad been made on June 28, 1938, are not a proper subject of this suit. We understand that, as to these lands, some person had in or before 1938 taken some preliminary step, which, if followed by the other requisite legal steps, would have resulted in his becoming the owner of the land, or of some mineral or other interest in it. Because of the Government’s agreement in 1880 to treat the ceded TJte lands as public lands of the United States, and because, in any event, it could, as the sovereign do what it pleased with them, it had the power to offer them to individuals for acquisition. But, as to the lands here in question, the individuals had not acquired them or paid for them. If they failed to take the necessary further steps to acquire the lands or an interest in them, as many of them do fail, the lands would have reverted to their former status. We think that the position of the United States as trustee of these lands for the plaintiffs continued, whatever incipient title the persons having pending or incomplete entries or having made mining locations may have acquired. What they had not yet acquired, and the right to receive payment from them if they did acquire an interest, was still in the Government, and was held by it for the benefit of the plaintiffs. The plaintiffs’ interest was taken by the Government by the Act of June 28,1938.
We deny the Government’s motion to instruct the Commissioner of this Court as requested. What we have said may serve as a guide to the Commissioner and the parties in their further proceedings.
Howell, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.