**Myron BROUGH, Plaintiff and Respondent,**

v.

**Ramon R. APPAWORA, Defendant
and Appellant.**

**No. 14434.**

Supreme Court of Utah.

Aug. 17, 1976.

·Scott C. Pugsley, of Boyden, Kennedy, Romney & Howard, Salt Lake City, for defendant-appellant.

Robert M. McRae of Hatch, McRae & Richardson, Salt Lake City, for plaintiff-respondent.

ELLETT, Justice:

The defendant appeals from a decision of the District Court of Uintah County declining to set aside a default judgment entered on behalf of the plaintiff on September 9, 1975. The plaintiff, a non-Indian, obtained a judgment by default for the sum of $28,800 general and special damages, together with costs of court. On or about October 22, 1975, defendant, an enrolled member of the Ute Indian tribe, appeared specially and moved the court to set aside the default judgment and dismiss the action on the basis that the court lacked jurisdiction over the defendant and the subject matter. The court denied the motion and the defendant is here seeking a reversal.

The automobile accident out of which this action arose occurred on November 12, 1974, on a county road in Uintah County approximately two miles south of Fort Duchesne, Utah. The defendant claims that the reservation on which he lives encompasses all the land within the "drainage of the Duchesne River from the snowcapped mountains on the north to the snowcapped mountains on the south." This area of land includes numerous cities and towns and thousands of acres of land owned and occupied by non-Indians.

■ The sole question presented on this appeal is whether or not the district courts of the State of Utah have jurisdiction over enrolled members of the Ute Indian tribe within the area drained by the Duchesne River and its tributaries.

The government of the United States formerly warred with the various Indian tribes and as a means of preventing further bloodshed, entered into treaties of peace with the ancestors of this defendant whereby certain lands were set apart for their use. With the advance of civilization and the increase in population, it was considered advisable for certain areas of the land to be sold. The Indians were granted specific lands chosen by themselves and the remaining land was sold to the government with a proviso that the money received from the sale thereof would be held in trust for the benefit of the Indians.

In 1905 President Theodore Roosevelt, by proclamation dated July 14, placed the land of the Indian reservation not theretofore allotted to Indians back on the public domain.[1] Congress appropriated funds to pay for the land thus transferred, and the Indians accepted the money.[2]

■ Some 25 years ago, the Ute Indians got a judgment against the United States government for the money which it had received from the sale of the reservation land lying in the State of Colorado.[3] That judgment totaled $31,938,473.43. The basis of their suit against the government was that they had an interest in the land in the nature of a lien to secure the payment to the Ute tribes of the money received by the government for the land which had been taken back into the public domain and sold to the public. By this judgment, and the satisfaction thereof, the Indians lost all rights which they or their ancestors ever had in or to the land not theretofore allocated to them. No longer can an Indian migrant carry about him a protecting mantle which makes him immune to the law of the land so long as he does not stray beyond the snowcapped mountains to the north and south of the Duchesne drainage basin.

A treaty can only exist between independent, sovereign powers.[4] Several generations ago the United States government entered into a so-called treaty of peace with the nation of Ute Indians. The United States Supreme Court in *DeCoteau v. District County Court*[5] said that since that time, the government "had altered its general policy toward the Indian tribes." Further, the court stated: "After 1871, the tribes were no longer regarded as sovereign nations, and the Government began to regulate their affairs through statute or through contractual agreements ratified by statute."[6]

■ The Ute nation, of the long-ago treaty, no longer exists, and the descendants of the inhabitants of that nation are now citizens of the United States. When a nation ceases to exist, its treaties are no longer of any force or effect,[7] and the descendants of those who constituted the erstwhile nation cannot thereafter claim any benefits under the treaty. For a long time, Indians have claimed that they were not treated as citizens of this country. Now that they are citizens of the United States, some of them are unwilling to accept the responsibilities and duties which go with the privilege of citizenship.

In the case of *DeCoteau v. District Court,* supra, the question was presented as to whether or not the state court had jurisdiction of Indians within the confines of

1. 34 Statutes at Large, 3119 (1905).

2. 32 Statutes at Large, 264.

3. *Confederated Bands of Ute Indians v. United States*, 120 Ct.Cl. 609 (1951). See also 100 Ct.Cl. 413 (1943); 112 Ct.Cl. 123 (1948).

4. 87 C.J.S. Treaties § 1.

5. 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300; 211 N.W.2d 843 (S.D.1973).

6. Id.

7. 74 Am.Jur.2d § 12 (Treaties).

an original grant to the Indian tribe. There, as in the instant matter, the government had reduced the original reservation by the land not allocated to the Indians and had paid the tribe therefor. The South Dakota Supreme Court held that the land, within the boundaries of the original treaty, which had been purchased by the government and subsequently sold to white men, as was done in this case, was no longer "Indian Country" and that the state courts had jurisdiction over Indians therein. This ruling was affirmed by the Supreme Court of the United States in March, 1975.[8]

To declare the law to be as claimed by the appellant would be to abandon all forms of due process and permit an enrolled Indian to commit crimes or torts at will and be immune from any accountability to the law of the land. Any statute or court decision which would prevent an enrolled Indian from being tried under the law of the land for a tort or crime committed by that Indian would be in contravention of the due process clause of the Constitution.

To permit an Indian who commits a murder in any of the various towns in the drainage area of the Duchesne River to show disdain for the prosecuting officials and claim the sanctuary of the tribal method of procedure is unthinkable.

The judgment of the trial court was correct and it is affirmed. Costs are awarded to the respondent.

CROCKETT, J., concurs.

HENRIOD, C. J., concurs in the result.

TUCKETT, Justice (dissenting).

I respectfully dissent.

An affidavit of the superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs, Fort Duchesne, discloses that the place where the accident occurred was located entirely within the exterior boundaries of the Uintah and Ouray Reservation. The affidavit further discloses that the Ute Indian Tribe is a federally recognized tribe exercising the powers of government within the boundaries of the reservation. A tribal court has been established by the Ute Indian Tribe which has jurisdiction over all civil cases involving enrolled members of the tribe. The sole question presented on appeal is whether or not the District Court of Uintah County had jurisdiction to entertain and to determine the controversy which arose on the tribal reservation and in which an enrolled Indian of the Ute Tribe was a party defendant.

Under federal statutes "Indian country" is defined as follows:

> . . . the term "Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

While 18 U.S.C., Sec. 1151, above quoted on its face only deals with criminal jurisdiction it has been recognized that it generally applies as well to questions of civil jurisdiction.[1] Title 25, Sec. 1322, is a grant of power by Congress to the states pertaining to jurisdiction by the states over civil causes in which Indians are parties. That section is in the following language:

> The consent of the United States is hereby given to any State not having

8. 420 U.S. 425, 95 S.Ct. 1082.

1. *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300;

*McClanahan v. Arizona Tax Com.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed. 129; *U. S. v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L. Ed. 195.

jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

Section 1326, Title 25, deals with the process by which the State may acquire jurisdiction. That section is in the following language:

State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other government body, or by 20 per centum of such enrolled adults.

Pursuant to the acts of Congress above set forth, in 1971 the Utah Legislature adopted two statutes pertaining to the subject. Section 63–36–9, U.C.A.1953, as amended, provides as follows:

The state of Utah hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, country and lands or any portion thereof within this state in accordance with the consent of the United States given by the act of April 11, 1968 . . . .

Section 63–36–10, which is also pertinent here, is in the following language:

State jurisdiction acquired or retroceded pursuant to this ·act with respect to criminal offenses or civil causes of action shall be applicable in Indian country only where the enrolled Indians residing within the affected area of such Indian country accept state jurisdiction or request its retrocession by a majority vote of the adult Indians voting at a special election held for that purpose. All special elections shall be called pursuant to federal law.[2]

The Ute Indian Tribe of the Uintah and Ouray reservation have not accepted state jurisdiction by a majority vote of the adult enrolled Indians residing within the reservation. The Indian reservation having been established by Congress, only the Congress could terminate the reservation or change its status.

The definition of "Indian reservation" as defined by Section 63–36–18, U.C.A.1953, as amended, indicates that rights of way running through the reservation are part of the reservation.[3]

2. Art. III, Constitution of Utah provides: "Second:—The people inhabiting this State do affirm and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries hereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. . . . "

3. *Gourneau v. Smith* (N.D.) 207 N.W.2d 256; *Kennerly v. Dist. Court of Ninth Jud. Dist. of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507.

I am of the opinion that the district court was without jurisdiction.

MAUGHAN, J., concurs in the views expressed in the dissenting opinion of TUCKETT, J.