KENNERLY ᴇᴛ ᴀʟ. *v.* DISTRICT COURT OF
THE NINTH JUDICIAL DISTRICT OF
MONTANA ᴇᴛ ᴀʟ.

No. 5370.   Decided January 18, 1971

Pᴇʀ Cᴜʀɪᴀᴍ.

This case arises on petition for certiorari from a judg-
ment of the Supreme Court of Montana.   The petition
for certiorari and the motion to proceed *in forma pauperis*
are granted.   For reasons appearing below, we vacate
the judgment of the Supreme Court of Montana and

remand the case for further proceedings not inconsistent with this opinion.

Petitioners are members of the Blackfeet Indian Tribe and reside on the Blackfeet Indian Reservation in Montana. The tribe is duly organized under the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* In July and August of 1964, petitioners purchased some food on credit from a grocery store located within the town limits of Browning, a town incorporated under the laws of Montana but located within the exterior boundaries of the Blackfeet Reservation.

A suit was commenced in the Montana state courts against petitioners on the debt arising from these transactions. Petitioners moved to dismiss the suit on the ground that the state courts lacked jurisdiction because the defendants were members of the Blackfeet Tribe and the transactions took place on the Indian reservation. The lower state court overruled the motion and petitioners, pursuant to Montana rules of procedure, petitioned the Supreme Court of Montana for a "writ of supervisory control" to review this lower court ruling. The State Supreme Court took jurisdiction and affirmed.

Prior to the passage of Title IV of the Civil Rights Act of 1968, 82 Stat. 78, 25 U. S. C. §§ 1321–1326 (1964 ed., Supp. V), discussed *infra,* state assumption of civil jurisdiction—in situations where Congress had not explicitly extended jurisdiction [1]—was governed by § 7 of

---

[1] For example, § 4 of the Act of August 15, 1953, 67 Stat. 589, 28 U. S. C. § 1360 (a), extended jurisdiction over civil causes of action arising in Indian country to which Indians are parties to five States. The statute is illustrative of the detailed regulatory scrutiny which Congress has traditionally brought to bear on the extension of state jurisdiction, whether civil or criminal, to actions to which Indians are parties arising in Indian country. See also § 2 of the Act, 67 Stat. 588, 18 U. S. C. § 1162, extending criminal jurisdiction to the

the Act of August 15, 1953, 67 Stat. 590. Section 7 of that statute provided:

> "The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act [referring to §§ 2 and 4, see n. 1, *supra*], to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Pursuant to this statute, the Montana Legislature enacted Chapter 81, Laws of 1963 (§§ 83–801, 83–806, Montana Rev. Codes Ann. (1966)), extending criminal, but not civil, jurisdiction over Indians of the Flathead Indian Reservation. But Montana never took "affirmative legislative action"—concerning either civil or criminal jurisdiction—with respect to the Blackfeet Reservation.

However, on November 20, 1967, the Blackfeet Tribal Council adopted Chapter 2, Civil Action, § 1, as part of the Blackfeet Tribal Law and Order Code, which provides, in relevant part:

> "The Tribal Court and the State shall have concurrent and not exclusive jurisdiction of all suits wherein the defendant is a member of the Tribe which is brought before the Courts. . . ."

The Montana Supreme Court relied on this pre-1968 Tribal Council action as an alternative basis for the assertion of state civil jurisdiction over the instant liti-

---

same States over offenses involving Indians committed in Indian country. Montana was not one of the five States accorded civil and criminal jurisdiction under these sections of the statute.

gation.[2]  In *Williams* v. *Lee,* 358 U. S. 217 (1959), a
non-Indian brought suit against a Navajo Indian for a
debt arising out of a transaction which took place on the
Navajo Reservation.  The Arizona State Supreme Court
upheld the exercise of jurisdiction and we reversed.  In
the instant case, the Montana Supreme Court attempted
to reconcile its result with *Williams* on the theory that
the transfer of jurisdiction by unilateral tribal action is
consistent with the exercise of tribal powers of self-
government.  154 Mont. 488, 466 P. 2d 85.[3]

The Court in *Williams,* in the process of discussing the
general question of state action impinging on the affairs
of reservation Indians, noted that "[e]ssentially, absent
governing Acts of Congress, the question has always been

---

[2] As discussed *infra,* § 403 (b) of the Civil Rights Act of 1968,
82 Stat. 79, 25 U. S. C. § 1323 (b) (1964 ed., Supp. V), repealed § 7
of the Act of 1953.  But § 403 (b) provides: "such repeal shall not
affect any cession of jurisdiction made pursuant to [§ 7] prior to its
repeal." Further, §§ 402 and 406 of the 1968 Act, which govern the
assumption of civil jurisdiction by States, appear to cover only
States not presently having such jurisdiction.

The instant litigation commenced after the passage of the 1968
Act.  However, since the Tribal Council action preceded the 1968
Act—and under the state court's reasoning vested the State with
jurisdiction at that point in time—we must consider the validity of
the State's assertion of jurisdiction under the 1953 Act as well as the
1968 Act.

[3] The Montana Supreme Court also sought to distinguish *Williams*
outright on the ground that the plaintiff in that case had, at one
point, secured a writ of attachment on Indian-owned livestock on the
Navajo Reservation, bringing into play special federal protective
policies with regard to Indian livestock.  However, the Arizona Su-
preme Court judgment under review in *Williams* had set aside the
writ of attachment on the very basis relied upon by the Montana
Supreme Court in its opinion in this case as a distinguishing ground.
*Williams* v. *Lee,* 83 Ariz. 241, 247–248, 319 P. 2d 998, 1002–1003
(1958).  Respondent in *Williams* did not seek review of that portion
of the judgment; and, of course, the Court's opinion in *Williams* makes
no reference to the attachment.

whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U. S., at 220. With regard to the particular question of the extension of state jurisdiction over civil causes of action by or against Indians arising in Indian country, there was, at the time of the Tribal Council resolution, a "governing Act of Congress," *i. e.,* the Act of 1953. Section 7 of that statute conditioned the assumption of state jurisdiction on "affirmative legislative action" by the State; the Act made no provision whatsoever for tribal consent, either as a necessary or sufficient condition to the assumption of state jurisdiction. Nor was the requirement of affirmative legislative action an idle choice of words; the legislative history of the 1953 statute shows that the requirement was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities. See H. R. Rep. No. 848, 83d Cong., 1st Sess., 6, 7 (1953); *Williams, supra,* at 220–221. Our conclusion as to the intended governing force of § 7 of the 1953 Act is reinforced by the comprehensive and detailed congressional scrutiny manifested in those instances where Congress has undertaken to extend the civil or criminal jurisdictions of certain States to Indian country. See n. 1, *supra.*

In *Williams,* the Court went on to note the absence of affirmative congressional action, or affirmative legislative action by the people of Arizona within the meaning of the 1953 Act. 358 U. S., at 222–223. Here it is conceded that Montana took no affirmative legislative action with respect to the Blackfeet Reservation. The unilateral action of the Tribal Council was insufficient to vest Montana with jurisdiction over Indian country under the 1953 Act.

The remaining question is whether the pre-1968 manifestation of tribal consent by tribal council action can operate to vest Montana with jurisdiction under the provision of the Civil Rights Act of 1968. Title IV of the 1968 statute repealed § 7 of the 1953 Act [4] and substituted a new regulatory scheme for the extension of state civil and criminal jurisdiction to litigation involving Indians arising in Indian country. See 25 U. S. C. §§ 1321–1326 (1964 ed., Supp. V). Section 402 (a) of the Act, 25 U. S. C. § 1322 (a) (1964 ed., Supp. V), dealing with civil jurisdiction, provides:

> "The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians' or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."

Section 406 of the Act, 25 U. S. C. § 1326 (1964 ed., Supp. V), then provides:

> "State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled

---

[4] But see n. 2, *supra*.

> Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults."

We think the meaning of these provisions is clear: the tribal consent that is prerequisite to the assumption of state jurisdiction under the provisions of Title IV of the Act must be manifested by majority vote of the enrolled Indians within the affected area of Indian country.[5] Legislative action by the Tribal Council does not comport with the explicit requirements of the Act.

Finally, with regard to the 1968 enactment, this case presents no question concerning the power of the Indian tribes to place time, geographical, or other conditions on the "tribal consent" to state exercise of jurisdiction. Rather, we are presented solely with a question of the *procedures* by which "tribal consent" must be manifested under the new Act. Thus the suggestion made

---

[5] The plain meaning of the statute is reinforced by the legislative history. Title IV of the 1968 Act was offered and principally sponsored by Senator Ervin of North Carolina as part of an amendment by way of a substitute to H. R. 2516, which eventually became part of the Civil Rights Act of 1968. See 114 Cong. Rec. 393–395. In discussing Title IV, Senator Ervin stated, *id.,* at 394:

"This title repeals section 7 [of the 1953 Act] and authorizes States to assert civil and criminal jurisdiction in Indian country only after acquiring the consent of the tribes in the States by referendum of all reservated Indians."

See also S. Rep. No. 721, 90th Cong., 1st Sess., 32 (1967) (additional views of Sen. Ervin). Senator Ervin's proposals were eventually adopted as an amendment to the Dirksen amendment to the 1968 Act. See 114 Cong. Rec. 5836–5838.

in dissent that, under today's disposition, "[t]he reservation Indians must now choose between exclusive tribal court jurisdiction on the one hand and permanent, irrevocable state jurisdiction on the other," is incorrect.[6]

The judgment of the Supreme Court of Montana is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE joins, dissenting.

This case does not involve state action infringing "the right of reservation Indians to make their own laws and be ruled by them." *Williams* v. *Lee,* 358 U. S. 217, 220. To the contrary, the exercise of state jurisdiction complained of here was expressly authorized by tribal law. Blackfeet Tribal Law and Order Code, c. 2, § 1. The Court holds that this tribal law is invalid because Congress has restricted the right of Indian self-government by specifying the exclusive procedure by which reservation Indians may confer on a state court jurisdiction over them.

I think that Congress did not intend in enacting either § 7 of the Act of August 15, 1953, 67 Stat. 590, or the successor to that section, Title IV of the Civil Rights Act of 1968, §§ 402 (a), 406, 25 U. S. C. §§ 1322, 1326 (1964 ed., Supp. V), to invalidate tribal legislation that author-

---

[6] The dissent's rebutting footnote infers from the express allowance for selective state exercise of jurisdiction a congressional intent to exclude selective tribal consent to state exercise of jurisdiction. That inference is so obviously not compelled by either the language or structure of 25 U. S. C. § 1322 (a) (1964 ed., Supp. V), the full text of which is quoted above, that we think no further response is needed. We reiterate, however, that with respect to the 1968 enactment, today's decision is concerned solely with procedural mechanisms by which tribal consent must be registered.

izes state courts to take jurisdiction over actions brought against a member of the tribe. It is plain to me that these statutes reflect only a congressional determination that there is a need for protective limitations when state jurisdiction over reservation Indians is to be *permanently* authorized. But I can find in these statutes no suggestion that Congress determined that such limitations are necessary when reservation Indians pass a law that authorizes state court jurisdiction over them. Nor can I see any reason to suppose that to invalidate such a law will effectuate the purpose of Congress. When state court jurisdiction over reservation Indians rests on tribal legislation, as distinct from a permanent federal authorization, the interests of the reservation Indians are fully protected by their ability to repeal the grant of jurisdiction to the state courts and thereby to return exclusive jurisdiction to their own courts.

The decision reached by the Court today substantially frustrates productive self-government by reservation Indians because it unjustifiably reduces the options available to them with respect to state court jurisdiction. The reservation Indians must now choose between exclusive tribal court jurisdiction on the one hand and permanent, irrevocable state jurisdiction on the other.* This means that because of a temporary inability to maintain a tribal court, reservation Indians may find it necessary to cede jurisdiction to a State for all time.

---

*The Court suggests that this dilemma is imaginary because the tribe may attach conditions to its consent. I fail to understand how the problem can be avoided in this way. When state jurisdiction is assumed pursuant to 25 U. S. C. § 1322 (a) (1964 ed., Supp. V), it is the State and not the tribe that determines the scope of the jurisdiction to which the tribe may consent. That section authorizes a State to assume "such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof *as may be determined by such State* . . . ." (Emphasis added.)

It also means that reservation Indians do not have the option of a trial period of state jurisdiction under the authority of their own laws. I cannot believe that Congress intended to withdraw these options.

Finally, it seems to me quite wrong to invalidate an enactment of the Blackfeet Tribal Council, which is not a party to this litigation, without first giving the Council an opportunity at least to submit a brief in support of its legislation. Before deciding this case the Court requested the Solicitor General to submit the views of the United States, whose law the Court now interprets as controlling. I should have thought the most basic principles of fair play would dictate a like request to the Blackfeet Tribal Council before the Court strikes down its law as invalid.