512 P.2d 954

**Emmett K. HUNT and Mary E. Hunt, his wife, Appellants,**

v.

**Fred L. O'CHESKEY, Commissioner of the Bureau of Revenue of the State of New Mexico and the Bureau of Revenue of the State of New Mexico, Appellees.**

No. 931.

Court of Appeals of New Mexico.

Feb. 9, 1973.

Rehearing Denied March 5, 1973.

Philip R. Ashby, Albuquerque, for appellants.

David L. Norvell, Atty. Gen., John C. Cook, Curtis W. Schwartz, Bureau of Revenue, Asst. Attys. Gen., Santa Fe, for appellees.

L. Lamar Parrish, Ussery, Burciaga & Parrish, Victor R. Ortega, U. S. Atty., James B. Grant, Asst. U. S. Atty., Albuquerque, Kent Frizzell, Asst. Atty. Gen., of the U. S., George R. Hyde, Dirk D. Snel, Dept. of Justice, Washington, D. C., amicus curiae.

## ORDER

[ This appeal questions the authority of New Mexico to tax income and gross receipts of Indians residing on a reservation when the income and gross receipts involved are derived solely from activities within the reservation. All Judges of the panel are of the opinion that New Mexico may not tax gross receipts under the above circumstances. A majority are of the opinion that New Mexico may not tax income under the above circumstances. The Judges' opinions are attached.

Accordingly, the Commissioner's Decision and Order applying these taxes to the Hunts' income and gross receipts is reversed.

It is so ordered.

(s) JOE W. WOOD
Chief Judge

## OPINION

WOOD, Chief Judge.

The issues are: (1) disclaimer of authority to tax; (2) absence of authority; and (3) infringement on the right to self-government. In my opinion, New Mexico may tax the income but may not tax the gross receipts.

Hunt and his wife, Mary, are members of the Pueblo of Laguna. They reside on the lands of the Pueblo within the boundaries of the Pueblo. Their income is derived from three sources—business, salary and interest.

The business is a sole proprietorship. It consists of hauling water by truck within the boundaries of the Pueblo and is carried on solely on Pueblo lands. All real and personal property of the business is located within the Pueblo boundaries. The water is hauled pursuant to agreement between Hunt and the operator of two uranium mines. The water which is hauled is water owned by the Pueblo and obtained from water sources owned by the Pueblo. The operator of the uranium mines does so pursuant to a lease from the Pueblo which has been approved by the Secretary of the Interior pursuant to the laws of the United States.

The salary of Hunt is as director of the Pueblo of Laguna Neighborhood Youth Corps. This is a program sponsored by the Pueblo pursuant to a contract with the United States Department of Labor. The program is funded by money contributed jointly by the Pueblo and the federal government.

The interest is that paid on savings accounts. It is conceded that the savings accounts are not located on the reservation, and the interest is not earned on the reservation. It is conceded that this interest is taxable. The appeal has been abandoned as to this income.

The gross receipts which New Mexico proposes to tax are the gross receipts from the business identified above.

The Pueblo has a Constitution which has been approved by the Secretary of the Interior.

There is no issue as to the amounts of the proposed tax liability, the procedures for assessment of liability or the protests of no tax liability. The issue is New Mexico's authority to impose the two taxes.

*Disclaimer of authority.*

It is asserted that New Mexico Constitution, Art. XXI, § 2 " * * * contains a disclaimer of jurisdiction over Indian lands, the title to which has not been extinguished. The lands of the Pueblo of Laguna * * * fit this definition precisely." On this basis, it is contended that

New Mexico has disclaimed any authority to impose the taxes. I disagree.

The constitutional disclaimer " * * * is a disclaimer of proprietary interest * * * and not a disclaimer of governmental control. * * * " Sangre De Cristo Development Corporation, Inc. v. City of Santa Fe, 84 N.M. 343, 503 P.2d 323 (1972); Ghahate v. Bureau of Revenue, 80 N.M. 98, 451 P.2d 1002 (Ct.App. 1969) and cases therein cited. See Kake Village v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). "The disclaimer is a disclaimer of all right, title and interest to Indian lands until the title of the Indian tribes has been extinguished. The disclaimer provision is not applicable where there is no issue concerning Indian lands. * * * " *Ghahate,* supra. The imposition of a tax is the exercise of a governmental function. Ghahate, supra, n. 1. Thus, the constitutional disclaimer presents no obstacle to New Mexico's authority to tax. *Sangre De Cristo Development Corporation, Inc.,* supra.

*Absence of authority.*

The issue presented under this point is stated in various ways—that the Pueblo has inherent sovereignty, see Your Food Stores, Inc. (NSL) v. Village of Espanola, 68 N. M. 327, 361 P.2d 950 (1961), cert. denied. 368 U.S. 915, 82 S.Ct. 194, 7 L.Ed.2d 131 (1961); that it has aboriginal title; that the issue is political and not judicial; that the history of the Pueblo is inconsistent with New Mexico's asserted right of taxation; that Congress has consistently acted on the assumption that states have no power to tax reservation Indians, see Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed. 2d 251 (1959); that Congress has not given its consent to the taxes involved; that taxation of Indians by the federal government does not implicitly authorize taxation by the states; that the Pueblo is self-governing. There are other variations; but there is one theme. The theme is that New Mexico has no authority to tax absent specific authority from the federal government. We disagree.

It is not claimed that Congress has authorized New Mexico to impose the taxes involved or provided that New Mexico may not do so. Williams v. Lee, supra, states:

"* * * Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. . . ."

Kake Village v. Egan, supra, discussed several of the viewpoints outlined above and stated:

"* * * [E]ven on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law. . . ."

The general approach stated in Kake Village v. Egan, supra, was followed by this court and applied to a tax matter in Ghahate v. Bureau of Revenue, supra. A later opinion of the United States Supreme Court applied the language from Williams v. Lee, supra. Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L. Ed.2d 507 (1971). Arizona has taken the same approach in tax matters. Mc-Clanahan v. State Tax Commission, 14 Ariz.App. 452, 484 P.2d 221 (1971), proba ble jurisdiction noted by U. S. Supreme Court, see McClanahan v. State Tax Commission of Arizona, 406 U.S. 916, 92 S.Ct. 1763, 32 L.Ed.2d 115 (1972); Kahn v. Arizona State Tax Commission, 16 Ariz. App. 17, 490 P.2d 846 (1971). See also Makah Indian Tribe v. Tax Commission, 72 Wash.2d 613, 434 P.2d 580 (1967). I am aware that a contrary approach has been taken in some states. Commissioner of Taxation v. Brun, 286 Minn. 43, 174 N. W.2d 120 (1970); Pourier v. Board of County Com'rs of Shannon County, 83 S. D. 235, 157 N.W.2d 532 (1968); Makah Indian Tribe v. Clallam County, 73 Wash. 2d 677, 440 P.2d 442 (1968).

The approach I follow in this case is that stated in Williams v. Lee, supra, and followed in Kennerly v. District Court of Montana, supra. The question is whether the New Mexico taxes infringe on the right of the Indians of Laguna to make their own laws and be ruled by them. This question is concerned with infringement upon the Pueblo's right to self-government and not upon infringement of the rights of an individual Indian. Mc-Clanahan v. State Tax Commission, supra. Contrary statements in Your Food Stores, Inc. (NSL) v. Village of Espanola, supra, are inapplicable; that case is limited to its particular facts. Ghahate v. Bureau of Revenue, supra.

*Infringement.*

The Pueblo of Laguna has an approved Constitution and that Constitution authorizes the Pueblo Council, in the exercise of its legislative power, to levy and collect taxes and to regulate trade. These rights are clearly part of the Pueblo's powers of self-government.

Whether the two New Mexico taxes infringe on the Pueblo's right of self-government depends on the nature of the taxes.

(a) Income tax.

An income tax is a personal tax assessed upon the income of the person. It is not levied upon property or the operations of business but upon the acquisitions of the taxpayer, whatever the source. Mc-Clanahan v. State Tax Commission, supra. New Mexico's tax fits this definition. See §§ 72–15A–3 and 72–15A–10, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1971).

McClanahan v. State Tax Commission, supra, applied the Arizona income tax to income of reservation Indians after considering that "* * * an income tax by the Federal Government or a state upon the employee of the other does not interfere with the essential function of the government whose employee is being taxed. * * *" Compare: (1) Northwestern Cement Co. v. Minn., 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292 (1959) where it is stated that "* * * a net income tax on revenues derived from interstate commerce does not offend con-

stitutional limitations upon state interference with such commerce. * * *"; (2) Bradbury & Stamm Const. Co. v. Bureau of Revenue, 70 N.M. 226, 372 P.2d 808 (1962) where collection of a sales tax from one rendering services to the United States was held not to be a tax upon the United States or its agencies.

The Hunts assert: "* * * The mere fact that the State attempts to impose the tax is of itself, an interference with the governmental powers of the Tribe. * * *" I fail to see in what way there is an interference. The Pueblo's right to tax has not been tampered with. The fact that New Mexico seeks to tax the income and the Pueblo has authority to do so does not make the New Mexico tax objectionable as "double taxation." Pure Oil Co. v. State, 244 Ala. 258, 12 So.2d 861, 148 A.L. R. 260 (1943); Fox v. Board for Louisville & Jefferson County C. Home, 244 Ky. 1, 50 S.W.2d 67 (1932). No property of the Pueblo is involved. There is no interference with or tax upon an activity within the reservation. The tax is solely on the Hunts' net income. Section 72–15A–3, supra.

New Mexico's tax on the personal income of the Hunts does not interfere with Pueblo self-government. In my opinion, New Mexico has authority to impose the tax.

It has been suggested that authority to tax is lacking because New Mexico has no authority to collect the tax in its courts. Assuming, but not deciding, that New Mexico courts lack this jurisdiction, the suggestion presupposes non-compliance with the law. It fails to consider that there may be alternative methods of collection such as withholding by employers or possible enforcement in federal courts. See § 72–15–51, N.M.S.A. 1953 (Repl.Vol. 10, pt. 2) and § 72–13–71, N.M.S.A. 1953 (Repl.Vol. 10, pt. 2, Supp. 1971). The specific answer to the suggestion is that no question is presented in this case concerning collection of the tax. See Bell Telephone Laboratories v. Bureau of Revenue, 78 N.M. 78, 428 P.2d 617 (1966).

(b) Gross receipts tax.

The Constitution of the United States, Art. I, § 8, clause 3, gives the Congress authority: "To regulate Commerce * * * among the several States, and with the Indian Tribes." We are not concerned here with the phrase "with the Indian Tribes." Our concern is with the power to regulate interstate commerce.

"* * * [T]he Commerce Clause gives exclusive power to the Congress to regulate interstate commerce, and its failure to act on the subject in the area of taxation nevertheless requires that interstate commerce shall be free from any direct restrictions or impositions by the States. * * *" Northwestern Cement Co. v. Minn., supra. Cases cited in *Northwestern,* supra, are to the effect that a state may not tax the "privilege" of engaging in interstate commerce. Footnote 7 of the *Northwestern* opinion, 358 U.S. 463, 79 S.Ct. 365, concludes: "* * * This Court has consistently held that the 'privilege' of engaging in interstate commerce cannot be granted or withheld by a State, and that the assertion of state power to tax the 'privilege' is, therefore, a forbidden attempt to 'regulate' interstate commerce. * * *"

The applicable principle in this case is that a tax on the privilege of engaging in interstate commerce is an attempt to regulate such commerce. The analogy is that a tax on the privilege of a reservation Indian to engage in business exclusively on reservation land would be an attempt to regulate that business. In practical application, such is an attempt to regulate the activity of Indians on an Indian reservation and, thus, is an attempt to interfere with the Pueblo Council's authority to regulate activities on the reservation. Compare Williams v. Lee, supra.

Section 72–16A–2, N.M.S.A. 1953 (Repl. Vol. 10, pt. 2, Supp. 1971) states the purpose of New Mexico's gross receipts tax is to provide revenue "* * * by levying a tax on the privilege of engaging in certain

activities. * * *" Section 72–16A–4, N. M.S.A. 1953 (Repl.Vol. 10, pt. 2, Supp. 1971) imposes the tax on gross receipts "[f]or the privilege of engaging in business. * * *" New Mexico's attempt to tax the gross receipts of an Indian whose business is carried on exclusively upon reservation land is an attempt to determine what business may be carried on within the reservation. Such an attempt is an attempt to interfere with Indian self-government. This is particularly so since the business which New Mexico desires to regulate is the business of hauling, within the boundaries of the Pueblo, water which is owned by the Pueblo. New Mexico does not have the authority to tax the privilege of an Indian to engage in business on an Indian reservation.

The distinction between the income tax and the gross receipts tax is this: the income tax does not regulate or interfere with activities of Indians within a reservation; the gross receipts tax does.

I would affirm the Commissioner's Decision and Order applying the New Mexico income tax to the Hunts' income. I would reverse his Decision and Order applying New Mexico's gross receipts tax to the Hunts' business receipts.

## OPINION

HENDLEY, Judge.

The applicable facts and contentions are set forth in Chief Judge Wood's opinion. Under those facts, I hold that the State cannot tax gross-receipts or income.

Neither Congress nor the Pueblo has surrendered jurisdiction to the State of New Mexico. The Pueblo is self-governing subject only to the authority of Congress.

The question of a tax on income of Pueblo Indians is a purely political matter for Congress to resolve. I think the matter most unfortunate since the Pueblo receives so many benefits which are directly attributable to the State of New Mexico. However, the Federal government's long standing policy has been that of affirmative Congressional action before permitting State action.

I would reverse the decision and order of the Commissioner.

## OPINION

HERNANDEZ, Judge.

I concur in the opinion of Judge Wood as it relates to the issue of gross receipt tax. I disagree with the opinion of Judge Wood as it relates to the issue of income tax. The opinion of Judge Wood states that "It is not claimed that Congress has authorized New Mexico to impose the taxes involved or provided that New Mexico may not do so." It is on this point that I disagree. The state would be able to tax such income if it had assumed civil and criminal jurisdiction over the reservations by enacting the enabling provisions required by federal law, 25 U.S.C. §§ 1321, 1322 (1970). New Mexico has not done so; therefore New Mexico may not impose its income tax on members of Indian Tribes living on reservations.

Indian tribes have historically occupied a unique status in our framework of government. In Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832), Chief Justice Marshall held that an Indian tribe possess all the powers of any sovereign state. Referring specifically to the Cherokee Nation he said, "The whole intercourse between the United States and this nation, is by our constitution and laws, vested in the government of the United States." This doctrine has been subjected to only minor modifications "in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized. * * *" Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, (1959).

In explaining the reasoning of *Williams* Justice Black, writing for the Court, pointed out that:

"Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indi-

ans on a reservation. To assure adequate government of the Indian tribes it enacted comprehensive statutes in 1834 regulating trade with Indians and organizing a Department of Indian Affairs [citations omitted]. Not satisfied solely with centralized government of Indians, it encouraged tribal governments and courts to become stronger and more highly organized. [citation omitted].

Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. *This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to them.*" [Emphasis mine].

Our own Supreme Court has stated that the holdings of *Williams,* supra, and Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) mean that "state law can be made applicable to reservation Indians unless such applicability interferes with the internal self-government of the tribe or contravenes an express grant or reservation by Federal law." Natewa v. Natewa, 84 N.M. 69, 499 P.2d 691 (1972).

But there can be no doubt that the imposition of an income tax does interfere with the internal self-government of the tribe. The Laguna Pueblo, operating under a constitution approved by the United States Secretary of the Interior, gives the power to impose an income tax on Pueblo members to the Pueblo Council. In a 1969 decision, Ghahate v. Bureau of Revenue, 80 N.M. 98, 451 P.2d 1002 (Ct.App.1969), we held that New Mexico could impose an income tax on members of the Zuni Pueblo reservation; but we permitted such taxation only because the parties there entered into a stipulation providing that "The Zuni Indian Tribe itself is not inconvenienced, nor is it interfered with in any way, because of the fact Barton Ghahate and Evangeline R. Ghahate have been required to pay the individual income tax in question to the State of New Mexico." There was no such stipulation made by the Laguna Pueblo here and Ghahate, supra, is thereby distinguishable.

Moreover, I concluded that the attempted imposition of the state income tax "contravenes an express grant or reservation by Federal law." New Mexico has had the opportunity to assume civil and criminal jurisdiction over the Laguna Pueblo as well as all other pueblos and tribes in the State since 1953. The Act of August 15, 1953, ch. 505, § 6, 67 Stat. 590 (repealed 1968), provided in part:

"* * * the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act * * *"

The current statute, the Indian Civil Rights Act of 1968, 25 U.S.C. § 1322 (1970), now provides, in part:

"The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, *with the consent of the tribe* occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."

Section 1321(a) of 25 U.S.C., sets out similar provisions for state criminal offenses

and criminal jurisdictions. The crucial distinction between the 1953 legislation and the 1968 Civil Rights Act is that the assumption of jurisdiction by the State now requires not only legislative action by the State but also consent by the tribe or reservation concerned. New Mexico, of course, has adopted neither and exercises neither criminal nor civil jurisdiction over the reservations.

Taxation is largely a matter of jurisdiction. As early as 1819 the Supreme Court pointed out that there are limits to a State's power to tax, that taxation power, flowing from jurisdiction,

> " * * * is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation."

M'Culloch v. Maryland, 4 Wheat. 315, 4 L.Ed. 579 (1819). Similarly, a noted authority on Indian law has commented, "To the extent that Indians and Indian property within an Indian reservation are not subject to State laws, they are not subject to State tax laws." F. Cohen, Handbook of Federal Indian Law 254 (1970).

As recently as 1971, in a suit to recover a debt owed by some members of the Blackfeet Tribe on some purchases made in a store located within the boundaries of the Blackfeet Reservation the Supreme Court, citing §§ 1321 and 1322, supra, ruled that the Montana State court did not have jurisdiction to entertain such a suit because " * * * Montana never took 'affirmative legislative action'—concerning either civil or criminal jurisdiction—with respect to the Blackfeet Reservation."

In spite of the fact that the Blackfeet Tribe had enacted a provision giving concurrent jurisdiction to both tribal courts and the Montana State courts over any member of the tribe, the Court held:

> "With regard to the particular question of the extension of state jurisdiction over civil causes of action by or against Indians arising in Indian country, there was, at the time of the Tribal Council resolution, a 'governing Act of Congress' [the Act of 1953, supra]. Section 7 of that statute conditioned the assumption of state jurisdiction on 'affirmative legislative action' by the State; the Act made no provision whatsoever for tribal consent, either as a necessary or sufficient condition to the assumption of state jurisdiction. Nor was the requirement of affirmative legislative action an idle choice of words; the legislative history of the 1953 statute shows *that the requirement was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities."* [Emphasis mine]

Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507, (1971).

Under neither the 1953 nor the 1968 Acts, supra, has New Mexico manifested its willingness and ability to assume these responsibilities. Absent such affirmative legislative action together with the consent of the members of Laguna Pueblo, New Mexico does not have the authority to impose an income tax on the members of the Laguna Pueblo living on the reservation for income earned from employment or business conducted wholly within the boundaries of the Laguna Pueblo reservation.