Argued and submitted January 25, at University of Oregon, Eugene, affirmed
May 12, petition for review denied September 17, 2010 (349 Or 56)

STATE OF OREGON,
*Plaintiff-Respondent,*
*and*

Hardy MYERS,
Attorney General for the State of Oregon,
*Plaintiff,*
*v.*

Scott MAYBEE,
dba buycheapcigarettes.com,
dba smartsmoker.com,
dba ordersmokesdirect.com,
*Defendant-Appellant.*

Marion County Circuit Court
06C12593; A139270

232 P3d 970

Margaret A. Murphy, New York, argued the cause for appellant. With her on the briefs were James N. Westwood, Gregory R. Mowe, and Stoel Rives LLP.

Rolf C. Moan, Supreme Court Coordinator, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

.

## SCHUMAN, P. J.

In 1998, the State of Oregon, along with 46 other states, entered into the Master Settlement Agreement (MSA) with the leading tobacco product manufacturers in the United States. ORS 323.803(5). Pursuant to that agreement, the participating manufacturers were required, among other things, to pay substantial sums to the state annually. In return, the state released most "past, present, and * * * future claims against them[.]" *Id.* In order to neutralize the market advantage that nonparticipating manufacturers would have enjoyed by virtue of not having to make payments, the state, pursuant to the MSA, enacted a so-called Qualifying Escrow Act, ORS 323.800 to 323.806, requiring nonparticipating manufacturers to make payments into an escrow fund that would be used to ensure payment of any future judgment in favor of the state against those companies. ORS 323.806.

By 2003, however, Oregon legislators found that violations of the Qualifying Escrow Act "threaten[ed] the integrity of the tobacco Master Settlement Agreement, the fiscal soundness of the state, and the public health." ORS 180.400. In response, the state enacted a so-called Complementary Act, ORS 180.400 to 180.455, requiring each nonparticipating manufacturer whose cigarettes are sold in Oregon to provide the Attorney General with, among other things, a complete list of all of the brands it sold in Oregon in the preceding or current year. ORS 180.410(5)(a), (b). The cigarette brands of companies that have provided the required certifications are listed in a directory. ORS 180.425. It is unlawful for any person to "[s]ell, offer for sale or possess for sale in this state cigarettes of a tobacco product manufacturer or brand family" not included in that directory. ORS 180.440(1)(b) (2007).[1]

Defendant is an enrolled member of the Seneca Nation of Indians. He operates a tobacco retail business located within the Seneca Nation tribal territory in the State of New York. As part of his business, he maintains Internet

---

[1] Certain portions of the Complementary Act, including ORS 180.440(1)(b), were amended in the 2009 session of the Legislative Assembly. Or Laws 2009, ch 70, § 1; *see* Or Laws 2009, ch 227. Except as otherwise indicated, references throughout this opinion are to the 2007 version of the statutes.

websites on which he offers cigarettes for sale. Using the Internet, telephone, or mail, customers who have seen the Internet offers (including people in Oregon) transmit orders to defendant at his place of business. Once defendant receives payment, including payment for postage charges, he packages the cigarettes and mails them to consumers (including consumers in Oregon) using the United States Postal Service. Some of those cigarettes are of brands that are not contained in the Attorney General's directory.

In the present case, the Attorney General sought an injunction prohibiting defendant "from selling, offering for sale, accepting orders, possessing for sale in Oregon or transporting, to Oregon consumers cigarettes" that are not listed in the directory, contrary to the requirement of ORS 180.440(1)(b). Defendant conceded that he sells cigarettes to Oregon consumers and that some of the cigarette brands are not listed in the directory; he maintained, however, that ORS 180.440(1)(b) cannot be enforced against him for two reasons: first, Oregon laws regulating his activities are preempted by federal law because he is a member of an Indian tribe engaging in activities on an out-of-state Indian reservation; and second, in any event, he does not fall within the ambit of the Complementary Act, in particular ORS 180.440(1)(b), because he does not "sell, offer for sale or possess for sale" the unregistered brands *in Oregon.* The trial court rejected defendant's arguments and granted summary judgment in favor of the state, reasoning:

> "After conceding that there is no dispute regarding the material facts of this case, defendant nonetheless * * * contends that because his business is conducted via mail and the Internet, he should be exempt from complying with the provisions of ORS 180.400 to 180.455. Defendant's interpretation is contrary to the language and statutory framework of ORS 180.440 and the entire Complementary Act. Permitting distributers of noncompliant tobacco products to make an 'end run' around ORS 180.440(1)(b) by selling prohibited products to Oregon consumers via the Internet would undermine the statute's purpose as an enforcement tool."

Accordingly, the trial court concluded that "[t]he legislature clearly intended that defendant's sales are subject to the provisions of ORS 180.440." This appeal ensued.

Before this court, defendant renews his argument that the Complementary Act does not apply to him because he conducts no activities in Oregon. He also raises, for the first time, the argument that Oregon courts have no subject matter jurisdiction over activities that take place on out-of-state Indian reservations—an argument that is distinct from the argument that the Oregon legislature cannot impose substantive regulations on him. We affirm.

## I.  SUBJECT MATTER JURISDICTION

We begin with defendant's contention that Oregon state courts have no subject matter jurisdiction to adjudicate the state's claims against him because he is a Native American doing business on an out-of-state Indian reservation. *See State v. Hess*, 342 Or 647, 653 n 4, 159 P3d 309 (2007) (party may raise lack of subject matter jurisdiction at any time). Specifically, he asserts that the state improperly "brought this action against [defendant], an enrolled tribal member, for conduct that took place on an Indian reservation outside of Oregon." The state responds that the conduct addressed by this case "is not conduct that can be described as occurring on Seneca Nation territory in New York." Instead, according to the state, the subject of this litigation is defendant's conduct reaching outside the boundaries of the reservation and into the State of Oregon: offering to sell, and selling, unlisted cigarette brands to consumers in Oregon.

In support of his assertion that state courts have no jurisdiction to adjudicate this case, defendant relies on the United States Supreme Court's decisions in *Williams v. Lee*, 358 US 217, 79 S Ct 269, 3 L Ed 2d 251 (1959), and *Kennerly v. District Court of Montana*, 400 US 423, 91 S Ct 480, 27 L Ed 2d 507 (1971). In *Williams*, the Court considered whether, in the absence of congressional authority permitting it, a state court could adjudicate a civil action involving a non-Indian who operated a store on an Indian reservation against a Native American couple to whom he had sold goods on credit. It observed that the tribe had a legal system with courts that "exercise[d] broad criminal and civil jurisdiction

which cover[ed] suits by outsiders against Indian defendants." 358 US at 222. The Court reasoned that, under the circumstances presented,

"[t]here can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. *He was on the Reservation and the transaction with an Indian took place there.*"

*Id.* at 223 (emphasis added). Based on those considerations, the Court concluded that the state court was not free to exercise jurisdiction over the civil action. Similarly, in *Kennerly*, the Court was presented with a civil action to collect a debt brought in state court against members of an Indian tribe who purchased food on credit at a store located within the boundaries of the tribe's reservation. The Court observed that no federal statutory authority expressly provided for state court jurisdiction under the circumstances. *Kennerly*, 400 US at 428-30. As it had in *Williams*, the Court concluded that, in the absence of such authority, the state court did not have jurisdiction to adjudicate a dispute against tribal members for conduct that took place entirely on the reservation.

■■ In contrast to the rule articulated in *Williams* and *Kennerly*, state courts *may* exercise jurisdiction in civil cases involving Native Americans and relating to conduct that extends beyond the reservation's boundaries. *Puyallup Tribe v. Dept. of Game*, 391 US 392, 396 n 11, 88 S Ct 1725, 20 L Ed 2d 689 (1968) (state court had jurisdiction over an action to enjoin tribal members' violations of state law occurring off the reservation); *see also Mescalero Apache Tribe v. Jones*, 411 US 145, 148-49, 93 S Ct 1267, 36 L Ed 2d 114 (1973) ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."). Thus, defendant's reliance on *Williams* and *Kennerly* is based on the premise that the conduct giving rise to the state's action against him takes place

wholly on tribal territory in New York. If, on the other hand, the relevant conduct can be seen as occurring in Oregon, the courts of this state have authority to adjudicate the state's action to enjoin that conduct.

It is undisputed that defendant's place of business is physically located on tribal territory in New York. Furthermore, defendant does not personally leave his place of business when he accepts and fills orders for cigarettes. However, defendant's Internet websites are accessible in Oregon. He accepts cigarette orders by telephone and through the Internet from customers who receive his offer when they are in Oregon, accept that offer by placing their orders while in Oregon, and receive the unlisted cigarettes in Oregon. Thus, contrary to his assertion, defendant's activities reach beyond the reservation boundaries and into Oregon. If defendant wants to compose his website and make it available on the Internet, he is free to do so if the site specifies that the offer is not valid in Oregon. Oregon seeks to regulate his activities only insofar as they reach beyond the reservation and into this state. Put another way: If defendant were sending actual agents into Oregon to solicit orders for cigarettes, carry the orders back to New York with payment, and then personally deliver the cigarettes to Oregon consumers, it would be clear beyond dispute that defendant's business activities extend beyond the reservation and into Oregon and that his agents could be regulated. The fact that he harnesses technology to venture into Oregon with offers and to convey Oregonians' orders back to New York, and then employs the mail to make his deliveries, does not change the basic nature of the transaction. We conclude that the courts of this state have subject matter jurisdiction to adjudicate the claims at issue in this case. *Accord Department of Health and Human Services v. Maybee*, 2009 Me 15, ¶ 6, 965 A2d 55 (2009) (concluding that state court had authority to adjudicate case involving the defendant's cigarette sales over the Internet because the defendant, "as a delivery seller, engages in activity that reaches beyond the reservation when he accepts orders from and sends cigarettes to consumers who are off the reservation").

## II. STATUTORY INTERPRETATION

A. *ORS 180.440(1)(b) applies to unstamped as well as stamped cigarettes.*

In his second assignment of error, defendant advances several arguments in support of his assertion that his conduct does not violate ORS 180.440(1)(b), which, as noted above, provides that a person may not

"[s]ell, offer for sale or possess for sale in this state cigarettes of a tobacco product manufacturer or brand family that the person acquired at a time when the tobacco product manufacturer or brand family was not included in the directory developed under ORS 180.425[.]"

First, defendant appears to argue that the statute does not apply to him because the cigarettes that he sends into Oregon do not have an Oregon tax stamp. He reasons as follows: The Complementary Act, of which ORS 180.440 is a part, was intended to facilitate enforcement of the Qualifying Escrow Act. ORS 180.400 ("The Legislative Assembly finds that enacting procedural enhancements will aid the enforcement of [the Qualifying Escrow Act].'"). The Qualifying Escrow Act, however, requires nonparticipating manufacturers to make payments based, not on cigarettes shipped into Oregon, but on "units sold." ORS 323.806(2)(a). "Units sold," in turn, refers to *stamped* tobacco products. ORS 323.800(10). (It is undisputed, defendant argues, that a person may ship unstamped cigarettes into Oregon; the onus of paying the tax and affixing the stamp falls on the in-state distributor. ORS 323.068.) Thus, because the Complementary Act serves to enforce the Qualifying Escrow Act, and the Qualifying Escrow Act does not require nonparticipating manufacturers to pay into the fund for unstamped cigarettes, the Complementary Act, including the penalty provision in ORS 180.440(1)(b), must not extend to unstamped cigarettes.

We conclude that that argument fails. Defendant suggests, and we can discern, no reason why the legislature would not believe that it could enhance enforcement of the Qualifying Escrow Act by requiring manufacturers and distributors to list *all* brands sold in Oregon, regardless of who (if anybody) ever paid taxes for them. In fact, that is precisely

what the legislature has done, and done in clear terms. Both the Qualifying Escrow Act and the Complementary Act distinguish between "cigarettes" and "units sold." ORS 180.405(2), (9); ORS 328.800(4), (10). Nonparticipating manufacturers must provide the Attorney General, for inclusion in the directory, a complete list of "[a]ll * * * brand families *and* the number of units of each brand family that were sold in the state during the preceding calendar year," ORS 180.410(5)(a) (emphasis added), and "[a]ll * * * brand families that have been sold in the state any time during the current calendar year[,]" ORS 180.410(5)(b). The manufacturer, in other words, must provide the Attorney General with the names of brand families of *cigarettes* sold in Oregon, and, in addition, the number of *units* of that brand family that were *sold*—if any. The prohibitions and penalty provisions of ORS 180.440(1)(b) fall on persons who sell or offer for sale in Oregon "*cigarettes* * * * of a brand family*" that is not in the Attorney General's directory. (Emphasis added.) Had the legislature intended that the directory contain only "units sold," it would have required manufacturers to submit to the Attorney General a list consisting of only "units sold." That is not what it did; instead, it required manufacturers to submit a list of "brand families" as well. Defendant concedes that he offered for sale and sold to Oregon consumers, "brand families" that are not in the directory.

B.  *Defendant's sales and offers to sell take place "in this state."*

■        That conclusion brings us to defendant's second argument: Even if ORS 180.440(1)(b) penalizes the sale of unstamped cigarettes in this state, the statute nonetheless does not apply to him because the sales do not take place "in this state" as that phrase is used in ORS 180.440(1)(b).[2] We have already rejected the argument that, with respect to subject matter jurisdiction, defendant's activities took place entirely on the Seneca reservation and did not reach into

_____

[2] As noted above, ORS 180.440(1)(b) was amended by the 2009 Legislative Assembly. The amendment consisted of eliminating the phrase "in this state." *See* Or Laws 2009, ch 70, § 1. The injunction at issue in this case, however, was granted under the 2007 version of the statute and, in any event, the deletion has no effect on our analysis. With or without the language, the relevant inquiry is whether the legislature intended the statute to apply to cigarettes shipped into Oregon.

Oregon. The same reasoning applies to defendant's argument that the statutory term "in this state" does not capture his sales activities. His offer reaches into this state, the offer is accepted here, and the final act of the transaction, receipt of the product, occurs here. The context within which ORS 180.440(1)(b) occurs supplies additional reasons to reject defendant's statutory interpretation argument.

Another subsection of ORS 180.440—subsection (2)—sets forth the criminal penalty for violations of ORS 180.440(1), and specifically references, as subject to that penalty, persons who violate subsection (1) when they "import [cigarettes] or cause [them] to be imported." That reference suggests that the prohibitions of ORS 180.440(1)(b) do not apply only to those who engage in wholly intrastate cigarette sales. Rather, ORS 180.440(2) suggests that the legislature intended sales "in this state" to include circumstances in which a person causes the cigarettes of a nonparticipating manufacturer to be imported into Oregon and made available for sale to consumers in Oregon.

The Complementary Act's regulation of "distributors" of cigarettes confirms that understanding. The Complementary Act contains several provisions directly relating to cigarette distributors. *See, e.g.*, ORS 180.410(1) (requiring certification from tobacco products manufacturers "whose cigarettes are sold in this state whether directly or through a distributor"); ORS 180.435 (imposing various obligations on distributors); ORS 180.455(4) (providing that the "Attorney General may seek an injunction to restrain a threatened or actual violation of ORS 180.435 or 180.440 by a distributor and to compel the distributor to comply with those sections"); *see also* ORS 180.440(2) (applying criminal penalty to one who "distributes" in violation of ORS 180.440(1)). A "distributor" includes "[a]ny person who sells or accepts orders for cigarettes that are to be transported from a point outside this state to a consumer within this state." ORS 323.015(2)(b); *see also* ORS 180.405 (as used in the Complementary Act, a distributor is any "person who is licensed under ORS 323.105 and any other person who is a distributor for the purposes of ORS 323.005 to 323.482"). As noted above, the legislature specifically contemplated that an

action for injunctive relief might be brought against a "distributor." Those statutory provisions, taken together, demonstrate that the legislature intended to regulate out-of-state actors who accept orders from and ship cigarettes to consumers located in Oregon.

Further, a broad construction of "in this state" as that term is used in ORS 180.440(1)(b) is consistent with the overall purpose of the statutory scheme. The legislature intended the Complementary Act to "safeguard the integrity of the Master Settlement Agreement, the fiscal soundness of the state and the public health" in light of violations of the Qualifying Escrow Act. ORS 180.400. When it enacted the Qualifying Escrow Act, the legislature recognized that "[c]igarette smoking presents serious public health concerns to the State of Oregon and to the citizens of the State of Oregon." ORS 323.803(1). Smoking "also presents serious financial concerns for the state." ORS 323.803(2). The state's policy, in light of those concerns, is that "financial burdens imposed on this state by cigarette smoking be borne by tobacco product manufacturers rather than by this state * * *." ORS 323.803(4). Pursuant to the Master Settlement Agreement, certain tobacco product manufacturers were required to pay substantial sums to the state. Because "[i]t would be contrary to the policy of the State of Oregon if those tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits[,]" the legislature established, in the Qualifying Escrow Act, a system whereby those manufacturers would be required to "establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise." ORS 323.803(6). The Complementary Act, in turn, provides broad "procedural enhancements[,]" ORS 180.400, that were not provided for in the Qualifying Escrow Act in order to ensure that the purpose of the latter statutory scheme is served. A broad construction of "in this state" to include sales of cigarettes by out-of-state sellers to consumers located in Oregon is consistent with that purpose. Defendant's reading of the statute, on the other hand, under which he can ship unlisted cigarettes into Oregon, creates a large loophole in

the overall statutory scheme. Accordingly, based on the text of the statute in the context of the whole statutory scheme, we conclude that "in this state" is broad enough to include the sales at issue here. Sales of the cigarettes of nonparticipating manufacturers from an out-of-state seller to purchasers located in Oregon constitute sales "in this state" for purposes of ORS 180.440(1)(b).

Nevertheless, according to defendant, his Internet sales of cigarettes to Oregon consumers do not take place in this state pursuant to the provisions of Oregon's Uniform Commercial Code (UCC) relating to sales, ORS 72.1010 to 72.8200, which he asserts should guide our decision in this case. He points to ORS 72.1060(1), which provides that a sale "consists in the passing of title from the seller to the buyer for a price." And, under ORS 72.4010(2)(a), if a contract for sale of goods "authorizes the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment[.]" Those provisions do not alter our conclusion that, for the purpose of ORS 180.440(1)(b), defendant sold cigarettes in Oregon.

As we have explained, the legislature's intent in ORS 180.440(1)(b) is clear from the text of that statute read in the context of the statutory scheme of which it is a part; there is no indication of any legislative intent that the UCC's provisions would apply. Indeed, there is good reason that the legislature, in enacting ORS 180.440, would not have intended to incorporate the provisions of the UCC cited by defendant. The UCC itself indicates that it was not meant to be applied, across the board, to the type of regulatory scheme at issue here. That legislative intent can be derived from the language of the statute along with the official comments. *U.S. National Bank v. Boge*, 311 Or 550, 563-64, 814 P2d 1082 (1991) (quoting *Security Bank v. Chiapuzio*, 304 Or 438, 445 n 6, 747 P2d 335 (1987)). ORS 72.1020 specifically states that the provisions of the UCC are not intended to impair "any statute regulating sales to consumers[.]" Furthermore, official comment 1 to UCC § 2-401, which was enacted as ORS 72.4010, explains that that section is meant to "deal[ ] with * * * issues between seller and buyer in terms of step by step performance or nonperformance under [a] contract for

sale[.]" It is *not* intended to affect the interpretation of public regulations whose applicability depends upon a sale or location of title. UCC § 2-401 Comment 1. The statute at issue here is unrelated to issues of performance between the seller and buyer; instead, it is part of a public regulatory scheme. Thus, we conclude that the provisions of the UCC cited by defendant are not relevant in the interpretation of ORS 180.440.

Finally, even if we were to agree with defendant that his sales of cigarettes do not occur "in this state," we would nonetheless conclude that his activities violate ORS 180.440(1)(b). That statute makes it unlawful for a person to sell *or* "offer for sale" an unlisted brand in this state. While defendant can make a plausible (albeit ultimately unconvincing) argument that the *sale* occurs when he receives the payment and ships the product in New York, the same cannot be said for his argument that the *offer* occurs in New York. If defendant's offer did not extend beyond the boundaries of New York, nobody in Oregon could accept it and Oregon would have nothing to regulate.

C. *Regulating defendant's activities in Oregon does not violate the Commerce Clause or the Indian Commerce Clause.*

Defendant argues that, if we construe the Complementary Act so as to allow the state to limit the cigarettes that he can ship into Oregon, the Act would violate the Commerce Clause and the Indian Commerce Clause, US Const, Art I, § 8, cl 3.[3] It is unclear from defendant's brief whether those arguments are part of his statutory construction argument, under the theory that we should *not* construe the Act to apply to him because doing so raises constitutional concerns, *see Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 481, 695 P2d 25 (1985) (statutes should be construed to avoid possible unconstitutionality), or if the arguments are independent constitutional challenges. In either case, we reject them without extended discussion.

---

[3] "The Congress shall have [p]ower [t]o * * * regulate [c]ommerce with foreign [n]ations, and among the several [s]tates, and with the Indian Tribes."

The only argument that defendant advances with respect to the Indian Commerce Clause is that state laws are presumed to be inapplicable to regulate the on-reservation conduct of Indians. As we concluded in dealing with defendant's arguments concerning subject matter jurisdiction and statutory interpretation, the state law involved in this case does not regulate defendant's on-reservation conduct.

By invoking the Commerce Clause, defendant argues that the Complementary Act unduly interferes with Congress's constitutional authority to regulate commerce among the several states, even though Congress has not enacted any law with which the state statute conflicts. In other words, defendant advances a so-called "dormant Commerce Clause" argument. *See, e.g.*, *CTS Corp. v. Dynamics Corp. of America*, 481 US 69, 107 S Ct 1637, 95 L Ed 2d 67 (1987). Dormant Commerce Clause jurisprudence is enormously complex and controversial. In essence, state laws may not overtly discriminate against out-of-state interests; they may not operate so as to protect in-state economic interests from out-of-state competition; and, even if they are facially neutral and neutral in operation, they must not impose a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970). The Complementary Act is nondiscriminatory; it applies with equal force to in-state and out-of-state persons who sell, offer for sale, or possess for sale in this state, unlisted cigarettes. It is not protectionist; no Oregon sellers or manufacturers receive an economic benefit from its operation. And the state interest at stake, public health, is weighty, while the burden on interstate commerce is minimal, in light of the fact that 46 other states have similar statutes. Further, defendant's perfunctory argument under the dormant Commerce Clause relies entirely on one case, *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F Supp 2d 313, 319-20 (EDNY 2006), which stands for the unremarkable proposition that a state may not regulate economic transactions that occur entirely out-of-state. That is not what occurs under the Complementary Act.

In sum: The trial court had subject matter jurisdiction over those aspects of defendant's activities that occur in Oregon. The court did not err in concluding that ORS

180.440(1)(b) applies to those activities and that, therefore, defendant cannot lawfully offer for sale or sell unlisted cigarettes to consumers in Oregon.

Affirmed.